1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7
FARINA FOCACCIA & CUCINA
ITALIANA, LLC,

Case No.  15-cv-02286-JCS
Related Case No. 15-cv-04931 JCS

8
              Plaintiff,

**ORDER RE CROSS MOTIONS FOR**
**SUMMARY JUDGMENT**

9
       v.

10
700 VALENCIA STREET LLC,

Dkt. No. 86 (Case No. 15-cv-02286 JCS)
Dkt. Nos. 50, 59 (Case No. 15-cv-04931
JCS)

11
              Defendant.

12

13
**I.       INTRODUCTION**

14
         These related cases involve a commercial lease between landlord 700 Valencia Street, LLC

15
("700 Valencia") and tenant Farina Focaccia & Cucina, LLC ("Farina") for a restaurant property

16
located at 702-706 Valencia Street, in San Francisco, California.  The Lease contains a five-year

17
renewal option that Farina alleges it timely exercised.  700 Valencia contends the option was not

18
properly exercised and seeks possession of the property.  Presently before the Court are the

19
parties' cross-motions for summary judgment (collectively, "the Motions").  A hearing on the

20
Motions was held on Friday, August 12, 2016 at 2:00 p.m.  At the request of the parties, the Court

21
delayed issuing its ruling until after the parties attended a settlement conference on September 28,

22
2016.  For the reasons stated below, the Motions are DENIED.[1]

23

24

25

26

27
_____

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28

28
U.S.C. § 636(c).

## II.      BACKGROUND

### A.      Factual Background[2]

#### 1.  The Lease

On May 30, 2010, 700 Valencia and Farina entered into a Commercial Lease ("Lease") for the property located at 702 - 706 Valencia Street ("the Property").  *See* Declaration of John O'Connor in Support of Plaintiff 700 Valencia Street, LLC's Motion for Summary Judgment and Summary Adjudication ("O'Connor Decl.") ¶ 3 & Ex. A (Lease).   The Lease specified that it was between "700 VALENCIA, LLC . . .and FARINA FOCACCIA & CUCINA ITALIANA, a DELAWARE LLC . . . ."  *Id*., Preamble.

The original term of the Lease was for five years: from May 1, 2010 through April 30, 2015, with rent set at $8,000/month for the first three years of the Lease and $8,400/month for the last two years of the Lease.  O'Connor Decl., Ex. A (Lease) ¶¶ 2, 4.   Rent was to be paid "in advance, on the first day of each month."  *Id*. ¶ 4.  The Lease further specified that rent was to be paid by personal check, cashier's check or money order, except if Tenant was "in default of any obligation of [the] Lease" or if Landlord "receive[d] from, or on behalf of, TENANT a total of ONE (1) or more checks which are returned to LANDLORD from a financial institution," in which case rent payments could only be by money order.  *Id*. ¶ 6.  In addition, the Lease provided for late charges and interest on rent payments made after the first of the month and a penalty of $50 for any returned rent check, "immediately due and payable upon notice to TENANT."  *Id*. ¶ 8.

The Lease required that Farina pay a $24,000 security deposit.  *Id*. ¶ 9.  The security deposit provision provides, in relevant part, as follows:

> 9.   SECURITY DEPOSIT/LAST MONTH'S RENT DEPOSIT: Upon TENANT's execution of this Lease, TENANT shall deposit with LANDLORD the sum of $24,000.00, which shall be held by LANDLORD as security for the faithful performance by TENANT of all of the terms, covenants, and conditions of this Lease, it being expressly understood and agreed that the Security Deposit is not an advance deposit of rent or a measure of LANDLORD's damages in case of TENANT's default. The Security Deposit may be retained,

---

[2] Unless otherwise noted, the facts set forth below are ones the Court finds to be undisputed based on the evidence in the record.

United States District Court
Northern District of California

used or applied by LANDLORD to remedy any default by TENANT, to repair damage caused by TENANT to any part of the Premises or the Building, and to clean the Premises upon the expiration or earlier termination of this Lease, as well as to reimburse LANDLORD for any amount which LANDLORD may spend by reason of TENANT's default or to compensate LANDLORD for any other loss or damage which LANDLORD may suffer by reason of TENANT's default. If any portion of the Security Deposit is so used or applied, TENANT shall, within ten (10) days after written demand therefor, deposit cash with LANDLORD in an amount sufficient to restore the Security Deposit to the full amount required hereunder, and TENANT's failure to do so shall be a material breach of this Lease. LANDLORD shall not be required to keep the Security Deposit separate from its general funds, and TENANT shall not be entitled to interest on, or any other compensation for, LANDLORD's retention of the Security Deposit. TENANT may not elect to apply any portion of the Security Deposit toward payment of Base Rent or any other amounts payable by TENANT under this Lease, although LANDLORD may elect to do so in the event TENANT is in default or is insolvent. If TENANT shall fully and faithfully perform every provision of this Lease to be performed by it, the Security Deposit or any balance thereof shall be returned to TENANT at TENANT's last known address (or, at LANDLORD's option, to the last assignee of TENANT's interest hereunder) within thirty (30) days after the Term has ended and TENANT has vacated the Premises.  . . .

*Id*. ¶ 9.

Under the Lease, the Tenant was responsible for the payment of "all real estate taxes for the building of the Premises . . . within 15 days of the billing date," *id*. ¶ 5, and all utilities and services, *id*. ¶ 10.  In addition, the Tenant was required to keep the Property free from any liens. *Id*. ¶ 24.4.  Where a lien was imposed, the Tenant was required to make payment or post a proper bond within twenty days to release the lien.  *Id*. ¶ 24.4.  If the Tenant failed to do so, the Landlord had the right (but not the obligation) to pay off the lien and charge that amount, plus interest, to the Tenant.  *Id*.

The Lease also included options to renew for two additional five-year periods after the original term of the Lease.  *Id*. ¶ 56.  The provision addressing the terms of the options provides, in relevant part, as follows:

56 TENANT'S OPTION TO EXTEND TERM

56.1 *If TENANT shall not be in default* in performing any of TENANT'S obligations under this Lease, TENANT shall have the option to extend the term of this Lease on all the provisions contained in this Lease, except for minimum monthly rent, for two additional periods of five years each commencing on May 1, 2015

3

1      and ending on April 30, 2020 for the first period (herein referred to
2      as "Option Term One") following expiration of the Original Term,
    by giving notice of exercise of the option (herein referred to as
    "Option Notice") to LANDLORD at least THREE (3) months, but
3      not more than SIX (6) months, before the expiration of the original
    term.   TENANT shall have the option to extend the term of this
4      Lease and all its provisions except for minimum monthly rent for a
    second and final option period (herein referred to as "Option Two")
5      following expiration of Option Term One, by giving notice of
    exercise of the option (herein referred to as "Option Notice") to
6      LANDLORD at least THREE (3) months but not more than SIX (6)
    months, before the expiration of termination of Option Term One.
7      Such notices shall be in writing and delivered by certified mail to
    LANDLORD.

8  O'Connor Decl., Ex. A (Lease) ¶ 56 (emphasis added).  The rent for Option Periods One and Two

9  was to be $8,820/month and $9,702/month, respectively.  *Id*. ¶ 56.6.   Although the Lease contains

10  a provision specifying that the Landlord shall be considered to be in default only after it has been

11  given written notice and 30 days to cure any failure to perform under the Lease, *see id*., ¶ 32, there

12  is no comparable provision in the Lease requiring that the Tenant must be given written notice and

13  an opportunity to cure before being deemed in default.

14        The Lease contains a provision prohibiting subletting of the Property without the written

15  consent of the Landlord, providing in relevant part as follows:

16      26. ASSIGNMENT AND SUBLETTING:
17          26.1. LANDLORD's Consent Required. TENANT shall not sell,
        assign, mortgage, pledge, hypothecate, encumber or otherwise
        transfer this Lease or any interest therein, and shall not sublet the
18          Premises or any part thereof, or suffer or permit the Premises or any
        part thereof to be occupied by any other person (the agents,
19          employees, and invitees of TENANT excepted), without the prior
        written consent of LANDLORD in each instance; and any attempt to
20          do so without such consent shall be voidable and, at LANDLORD's
        election, shall constitute a noncurable default under this Lease. No
21          interest of TENANT in this Lease or the Premises shall be
        assignable by operation of law. Subject to the terms and conditions
22          contained in this section, LANDLORD shall not unreasonably
        withhold its consent to a voluntary assignment of this Lease or a
23          subletting of the Premises.

24  *Id*. ¶ 26.1.   Paragraph 26 also requires that requests for permission to assign or sublet be made to

25  the Landlord in writing "at least thirty (30) days prior to the proposed effective date of the

26  assignment or sublease" and that the Tenant provide the Landlord with "such financial information

27  as LANDLORD may request concerning the proposed assignee or subtenant, including recent

28  financial statements and bank references."  *Id*. ¶ 26.2.

### 2. Construction of Farina Pizza

The Property is a mixed-use property and the building was new when Farina entered into the Lease; according to Luca Minna, who signed the Lease on behalf of Farina, at that time the building was "an empty shell."  Declaration of Luca Minna in Support of Farina Foccaccia's Motion for Summary Judgment ("Minna Decl.") ¶ 3.  Farina hired 700 Valencia and John O'Connor as a general contractor to build a restaurant called Farina Pizza in the space, allegedly investing approximately $2 million in tenant improvements and restaurant equipment.  *Id*.  The restaurant opened in August 2012.  *Id*.  According to Minna, Farina was willing to make this investment (and pay monthly rent during the construction period) because of the two five-year option periods included in the Lease.  *Id*.

### 3. The Kostelni Sublease[3]

On October 7, 2013, Mateo Giacomazzi, an employee of Farina, sent an email to John O'Connor asking if 700 Valencia would agree to modify the language of the Lease to provide that 700 Valencia's agreement was with "James Hugo Kostelni (doing business as FARINA PIZZA & CUCINA ITALIANA)" instead of "FARINA FOCACCIA & CUCINA ITALIANA, a Delaware LLC."  O'Connor Decl., Ex. B (October 7, 2013 email).  The reason for the request, the letter explained, was that the application for a liquor license that Farina had submitted to the Department of Alcoholic Beverages ("ABC") was in Mr. Kostelni's name and ABC had requested a copy of a lease showing that Mr. Kostelni was a tenant of the premises for which the license was sought.  *Id*.

Two days later, in a text message to O'Connor, Giacomazzi followed up asking if O'Connor had received his e-mail.  *Id*., Ex. C (text message exchange between O'Connor and Giacomazzi).[4]  O'Connor responded, "yes got your email don't think that can be accomplished

---

[3] Just a few days before oral argument on the Motions, 700 Valencia obtained new evidence from ABC relating to the Kostelni sublease and requested leave to submit this evidence in support of its summary judgment motion.  *See* Docket No. 59, Case No. 15-cv-04931 JCS.  While 700 Valencia may introduce this new evidence at the upcoming bench trial, the Court denies its request for leave to offer this evidence in support of its summary judgment motion because it does not alter the Court's conclusion that there are fact questions that preclude summary judgment relating to whether Farnina's conduct constituted a material breach, as discussed below.

[4] Farina has not challenged the authenticity of the text messages provided as Exhibit C to the O'Connor Declaration, which the Court assumes to be authentic.  Farina's counsel stated at the

United States District Court
Northern District of California

will run it by attorney." *Id*.  The next day, Giacomazzi responded:

> It is only paperwork to get the final license with the abc (JH Kostelni was the one applying for the alcohol license).  It can be voided right after we get the license.  The master lease will remain the same as it is now.  Please let me know.  We have a due date for tomorrow.

*Id*.  O'Connor, in turn, responded:

> How do you propose to do this.  Construction final payment has not being received rent December 2010 not made You want me to transfer lease to JH no financials no credit check in good faith Legal advice is not to do this.

*Id*.

According to O'Connor, he declined Farina's request and Farina never "contacted [him] again concerning a sublease for 702-706 Valencia." O'Connor Decl. ¶ 5.[5] According to Luca Minna, however, Minna recalls asking O'Connor for permission to add Kostelni as a *co*-tenant on two occasions, once on February 21, 2013 and again on July 22, 2014.  *See* Supplemental Declaration of Luca Minna in Support of Farina's Opposition to 700 Valencia's Motion for Summary Judgment ("Minna Supp. Decl.") ¶ 2.  Minna states in his declaration that Farina needed to have a lease agreement showing Kostelni as a tenant to pursue its liquor license application with ABC.  *Id*. ¶ 4.

Although 700 Valencia did not agree to change the name of the "Tenant" on the Lease (there is no evidence it ever asked for permission to sublet to Kostelni), 700 Valencia learned for the first time on May 13, 2015 that Farina had entered into a sublet agreement with Kostelni for 702, 704 and 706 Valencia Street.  Kostelni Decl., Ex. 1 (Kostelni Sublease);  Declaration of John O'Connor in Support of Defendant 700 Valencia Street, LLC's Opposition to Plaintiff Farina Focaccia & Cucina Italiana, LLC's Motion for Summary Judgment ("O'Connor Opposition Decl.") ¶ 7.  The agreement was between "Farina Focaccia & Cucina Italiana, a Delaware LLC"

---

hearing, however, that Giacomazzi's communications were not authorized by Farina.
[5] The Court notes that although O'Connor implies that Farina's request to list Kostelni as a party to the Lease was a request to "sublet" the Premises, there is nothing in the communications from Giacomazzi that indicates Farina was seeking to sublet the Premises to Kostelni; rather, it asked 700 Valencia to modify the Lease to show that Kostelni (dba Farina Pizz & Cucina Italian) was the Tenant rather than Farina Focaccia & Cucina Italiana, LLC, as stated in the Lease.

1  and "James H. Kostelni."  The term of the sublease was May 1, 2012 to April 30, 2015, with the

2  same five-year options to renew that were included in the Lease between Farina and 700 Valencia.

3  *Id.* ¶ 4.  The agreement carried a signature date of May 1, 2012, but according to 700 Valencia's

4  counsel, Kostelni testified at his recent deposition that the agreement was dated retroactively and

5  that he signed it in the fall of 2013 or 2014.  *See* Declaration of Jonathon W. Hughes in Support of

6  Plaintiff 700 Valencia Street, LLC's Reply Brief ("Hughes Decl."), ¶ 2.  700 Valencia further

7  contends that Kostelni testified that he submitted the application for a liquor license for Farina

8  Pizza in his own name, with the approval of Luca Minna.  *Id.*

9       Kostelni states in a declaration offered by 700 Valencia that the sublease expired on April

10  30, 2015 and that he did not exercise the option to extend the sublease for another five years.

11  Kostelni Decl. ¶ 5.

12            **4.  Exercise of the Option to Renew**

13       The evidence relating to whether Farina gave notice of its intent to exercise the first five-

14  year option is contradictory.  Indeed, it is difficult to avoid the conclusion that the sworn

15  testimony of at least one of the individuals involved (and possibly more than one) must be false.

16       According to Farina, it sent a timely notice of its intent to exercise the option to extend the

17  Lease for another five-year period by mailing a letter (hereinafter, "Option Notice") to O'Connor

18  by certified mail, as required under the Lease.  Farina has filed a copy of the Option Notice in

19  support of its summary judgment motion.  *See* Minna Decl., Ex. 3.  It is dated December 1, 2014

20  and is signed by Luca Minna (on behalf of Farina) and Michael Blitzer (on behalf of Global

21  Trading & Marketing, LLC).[6]  The Option Notice states, in relevant part, as follows:

22            With reference to the Commercial lease agreement (lease) between
             700 VALENCIA STREET, LLC (Landlord) and FARINA
23            FOCACCIA & CUCINA ITALIANA, LLC (Tenant) of the real
             property known as 702, 704 and 706 Valencia Street, San Francisco,
24            California 94110 (Premises), this notice is to exercise, effective as
             of January 1, 2015, the Tenant's option to extend term in accordance
25            to Clause 56 of the Lease (Option Term One).

26

27  _____

28  [6] Global Trading & Marketing, LLC apparently is a management company that has provided
   management services for Farina Pizza since January 2015.  *See* Minna Decl., Ex. 3.

United States District Court
Northern District of California

Option Term One extends the term of the lease on all the provisions contained in the lease, except for minimum monthly rent, for an additional period of five years, commencing on May 1, 2015 and ending April 30, 2020.

In accordance to Clause 56.6 of the lease, for Option Term One period, from May 1, 2015 to April30, 2020, the rent shall be $8,820 (eight thousand eight hundred twenty) per month.

*Id.*; *see also* Minna Decl. ¶ 6 (stating that he prepared and signed the Option Notice).

Farina also offers a declaration by Erica McDowell, who works for Global Trading & Marketing, LCC, attesting that the Option Notice was sent to 700 Valencia by certified mail. McDowell states, in relevant part, as follows:

1.  I am currently employed as a consultant to Global Trading & Marketing, LLC ("Global Trading").  As part of my job duties, I have assisted, and continue to assist, with office operations, including payment of bills, reconciliation of accounts and other office functions and transactions, including preparation of documentation and mailing of correspondence and other documentation. . . . .

2. I make this Declaration, having been advised that 700 Valencia Street LLC has stated that it never received the December 1, 2014 Option Notice Extension of Lease ("Option Notice"), signed by Luca Minna and Michael Blitzer.

3. After the Option Notice was prepared, it was signed by Mr. Minna and Mr. Blitzer.  After I was given the original Option Notice, I photocopied the document, printed it, and personally placed the Option Notice original document in an envelope with the cashier's  check for the restaurant  December rent, sealed it, and caused the envelope to be mailed to 700 Valencia Street LLC- sending it Certified Mail, Return Receipt Requested on December 9, 2014.  I also prepared the Certified Mail Return Receipt Request documentation - attaching it to the envelope that was mailed.

4. Thereafter, we received back a signed Certification, signed by John O'Connor on December 12, 2014. The last four digits of the Certified Mail stamp are 2843. The Certified Mail Receipt signed by Mr. O'Connor on December 12 bears the same last four digits.
5. I also sent, in December, apartment rent checks to 700 Valencia Street LLC -- sent Certified Mail, and caused the envelope to be mailed on  December 12, 2014. There was no request that the recipient sign a Receipt. The last four digits of this Certified Mail envelope are 2850. I have been advised that copies of these envelopes have been provided.

Declaration of Erica McDowell in Support of Motion for Summary Judgment ("McDowell Decl."), ¶¶ 1-4;  *see also* Minna Decl., Ex. 3 (including certified mail receipt  with last four digits 2843 signed by John O'Connor, dated December 12, 2014).

Farina also offers evidence that a copy of the same letter was provided to John O'Connor by Luca Minna in a face-to-face meeting on January 14, 2014.  Minna Decl. ¶ 7.  According to Minna, he handed O'Connor a "large brown envelope containing several documents."  *Id*.  Minna states that he also presented a meeting agenda, filed as an exhibit in support of Farina's summary judgment motion, that includes as an agenda item "Request of commercial lease amendment for second 5-years period after Option Term One including also [Global Trading & Marketing]." Minna Decl., Ex. 4.  The meeting agenda includes the footer "package of corporate documents for review and delivery to John O'Connor."  *Id*.  Erica McDowell states that she assembled the collection of documents contained in the brown envelope, that one of the documents was the Option Notice, and that she was present at the January 14, 2016 meeting between Minna and O'Connor.  McDowell Decl. ¶ 6.  According to McDowell, there "can be no question" that 700 Valencia received the Option Notice on December 12, 2014 and that it received another copy of that document on January 14, 2015.  *Id*. ¶ 7.

700 Valencia adamantly denies that it ever received the Option Notice.  In particular, John O'Connor states in his declaration as follows:

> 5.  In the course of this lawsuit, Farina has suggested that it sent to me, via certified mail, a notice of extension of the Lease Agreement; that I received this notice of extension on or around December 12, 2014; and that I signed for that envelope. That is false. Although I received and signed for an envelope from Farina on or around that date, it contained only rent payment. It did not contain a notice of extension or any similar document.

> 6. In the course of this lawsuit, Farina has suggested that it delivered to me, in person, a notice of extension of the Lease Agreement, and did so at a meeting on or around January 14, 2015.  That is false. Although I received documents from Farina on or around January 14, 2015, they consisted only of a temporary business registration certificate and a certificate of liability insurance.  These documents were not provided in a packet, but were handed to me individually. At this meeting, there was no discussion of the option to extend the lease, nor was there any documentation provided on that topic. I did not see any document purporting to be a notice of extension of the Lease Agreement until April 30, 2015, which was received by my attorney.

O'Connor Opposition Decl. ¶¶ 5-6.

United States District Court
Northern District of California

### 5. Rejection of Option by 700 Valencia

According to Minna, he first learned that 700 Valencia did not intend to extend the Lease when he received a March 30, 2015 email from 700 Valencia's then-counsel, John Zanghi, entitled Notice of Non-Renewal.  Minna Decl. ¶ 9.  Minna responded to the notice on March 31, 2015 and attached a copy of the Option Notice.  *Id.*  On May 6, 2015, attorney Zanghi responded, stating that his client had "never seen this letter or anything like it relative to exercising the lease option," that it appeared to be "out of context with the subsequent emails and texts."  *Id.*, Ex. 7.  He went on to state that "[a]side from the authenticity of the letter," "Farina Focaccia was in default in performing several of its obligations under the lease" at the time the option to extend "was purportedly exercised."  *Id.*  In particular, he stated as follows:

> At that time, Farina Focaccia owed more than $20,000 in late fees, property taxes for the years of 2011/2012 and 2012/2013 totaling more than $12,500, and returned check charges. There was also unpaid rent and late charges in the amount $8480 for December, 2010 which had been accruing interest at 10 percent per annum. The property also had utility and service liens against it as a result of your client failing to pay for services. There were ongoing investigations from the State Board of Equalization, the Office of the Treasurer & Tax Collector and Alcohol and Beverage Control- all of which runs counter to the lease provisions regarding the use of the premises and compliance with statutes and ordinances. Moreover, at the time Farina Focaccia purportedly exercised the non-transferable option of the lease, Farina Focaccia & Cucina Italiana was a cancelled and voided Limited Liability Company for more than 18 months in Delaware and was deemed forfeited by the California Secretary of State.  Based on the foregoing. It is anticipated that your client will reconsider its position and instead vacate the premises in an orderly manner.

*Id.*  700 Valencia's counsel did not reference the Kostelni Sublease; as noted above, according to O'Connor 700 Valencia did not become aware of that sublease until May 13, 2015, that is, a week after the email quoted above was sent.

### 6. Alleged Breaches of the Lease

#### a. Failure to pay property taxes

700 Valencia contends Farina "failed to pay property taxes, including for the years 2011-2012 and 2012-2013, which totaled approximately $12,500."  O'Connor Opposition Decl., ¶ 11. Valencia has filed a document dated November 7, 2014 and signed by O'Connor that purports to

10

reflect the amount of property taxes owed by Farina for these years, though there is no evidence in the record reflecting that this document was given to Farina. *See id*., Ex. I.  700 Valencia has also filed screenshots of a text message exchange that occurred in June and July of 2014 between Minna and O'Connor in which O'Connor wrote: "I will email wiring instructions for rent payments later also send property tax for 2012-2013 and let's see what we can resolved [sic] by year end." *Id*., Ex. J.  Minna responded by asking O'Connor to "provide [him] also with the property tax information for 2012-2013, as [he] could not find any information at the office." *Id*.

Farina challenges the authenticity of the November 7, 2014 document, which Minna says he had never seen prior to discovery in this case.  Minna Decl. ¶ 8.  Minna further states that Farina never received a demand for the allegedly unpaid property taxes and asserts that when it did receive a demand for the 2013-2014 property taxes (which came due in two installments), it paid those property taxes within a day or two of receiving text messages from John O'Connor requesting payment.  *Id*.  According to Minna, he was unaware of any property taxes that were due until he received the May 6, 2015 email discussed above.  *Id*.

### b.   Failure to timely pay rent for December 2010

According to 700 Valencia, Farina failed to "timely pay rent owed under the Lease Agreement for December 2010."  O'Connor Decl. ¶ 12.  700 Valencia points to an email from John O'Connor to Farina, dated January 10, 2011, informing Farina that it had not paid rent for December 2010 or January 2011.  O'Connor Decl., Ex. K.  Minna counters that the December 2010 was paid, pointing to the email that was sent in response to O'Connor's email, also dated January 2011, stating that a check in the amount of $8,000 had already been sent to O'Connor.  Minna Decl. ¶ 10 & Ex. 8.

### c.   Notices of Liens

700 Valencia contends it received two notices of a lien in the amount of $674.60 for failure to pay for garbage services.  O'Connor Decl. ¶ 13 & Ex. M.  The date of the lien is January 20, 2015, for garbage services provided in October 2014 for which payment was due on January 12, 2015.  *Id*.  O'Conner says he notified Farina of the lien many times before May 6, 2015.  *Id*.  According to Minna, 700 Valencia never may any demand for payment on the lien.  Minna Decl. ¶

1    10.

2        d.   Returned Rent Checks

3        O'Connor states that on "multiple occasions, Farina issued checks to 700 Valencia that

4    were missing a signature or had been drawn on accounts with insufficient funds causing 700

5    Valencia to incur fees for returned checks." O'Connor Decl. ¶ 14. In support of this

6    representation, O'Connor provides a copy of one check, dated 12/4/2013 in the amount of $8,400

7    (the monthly rent at that time) that was unsigned. O'Connor Decl., Ex. L. The exhibit also

8    includes copies of what appear to be rent checks (based on the amount of the checks) that were

9    returned for insufficient funds dated June 5, 2014, July 5, 2014 and September 8, 2014. *Id*. It

10   appears that three other checks were returned for insufficient funds in the summer of 2014, though

11   they do not appear to be rent checks for the Property covered by the Lease. *Id*.

12       e.   Late rent payments

13       According to O'Connor, Farina's rent was late over forty times. O'Connor Opposition

14   Decl. ¶ 15. Minna, however, contends the parties orally agreed that rent payments would not be

15   considered late until after the fourteenth day of the month, when the mortgage payment was due.

16   Minna Decl. ¶ 4. He further states that Farina's rent payments were made after that date on only

17   four occasions and that those four late payments were the result of errors by Farina's bank, Wells

18   Fargo. *Id*. Farina also offers evidence that certain of its checks were returned due to bank error.

19   Minna Decl., Ex. 11.

20   **B.   Contentions of the Parties**

21       700 Valencia asserts that it is entitled to summary judgment as to its unlawful detainer

22   claim and any overlapping claims asserted by Farina in Case No. C-15-02286 JCS (the "Breach of

23   Contract Action") because the undisputed facts establish that Farina was in default on the Lease

24   when it purportedly gave notice of its intent to exercise the option in Paragraph 56 and therefore,

25   Farina was not entitled to an extension of the Lease. In particular, 700 Valencia points to the

26   Kostelni sublease, which Farina entered into without 700 Valencia's permission (written or

27   otherwise), contrary to the requirements of Paragraph 26 of the Lease. 700 Valencia also contends

28   Farina lost its option to extend the Lease because of numerous other breaches of the Lease,

United States District Court
Northern District of California

12

including: 1) its alleged failure to pay property taxes in the amount of $12,500 for the years 2011-2012 and 2012-2013; 2) failure to timely pay rent for December 2010 in the amount of $8,480; and 3) incurring utility and service liens.  According to 700 Valencia, it notified Farina of these defaults numerous times during the period of Farina's tenancy.

Farina contends that loss of the option to extend constitutes a forfeiture under California law and therefore, that it the option to renew must be honored (assuming it is properly exercised) unless Farina *materially* breached the Lease and 700 Valencia gave Farina proper notice of the alleged defaults.  It asks the Court to hold on summary judgment that it was not in material breach of the Lease and in any event, any alleged defaults were waived by 700 Valencia's failure to give Farina notice of them, and therefore Farina was entitled to exercise the option to extend.  It further contends that the undisputed facts establish that it properly exercised that option by giving the required notice of its intent to extend the Lease.   In support of its assertion that it did not materially breach the Lease, Farina argues, *inter alia*, that  700 Valencia's reading of Paragraph 26 of the Lease, requiring that written permission be obtained before subletting the premises, did not apply to Kostelni because it contains an exception for "agents" and "employees" of Farina.  Farina also argues that the other breaches cited by 700 Valencia, including the alleged failure to pay property taxes, the lien and any fees on late rent payments, cannot be material because the total dollar amount of these defaults was less than the $24,000 security deposit that 700 Valencia held on the Lease and 700 Valencia should have used the security deposit to satisfy any outstanding fees and costs incurred by Farina's alleged defaults.

Finally, Farina argues that the undisputed evidence shows that it gave proper and timely written notice of its intent to extend the Lease, as required under the terms of the Lease.

## III.   ANALYSIS

### A.   Legal Standard Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-

13

1    moving party's claim, or to a defense on which the non-moving party will bear the burden of

2    persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has

3    made this showing, the burden then shifts to the party opposing summary judgment to designate

4    "specific facts showing there is a genuine issue for trial." *Id*. On summary judgment, the court

5    draws all reasonable factual inferences in favor of the non-movant. *Scott v. Harris*, 550 U.S. 372,

6    378 (2007).

7

8         **B.**     **Legal Standards Governing Forfeitures and Options to Extend Under California Law**

9         The disputes between the parties in these actions implicate two principles under California

10   law: the general rule that an option may be accepted or exercised only in strict compliance with its

11   terms, *see Renewable Land, LLC v. Rising Tree Wind Farm, LLC*, No. CV 12-0809 RT, 2013 WL

12   497628, at *1 (E.D. Cal. Feb. 7, 2013) (citing 1 Corbin on Contracts § 264 (1963)) and the

13   equitable principle that a party to a contract should not suffer a forfeiture as the result of a minor

14   or trivial breach of that contract. *See Superior Motels, Inc. v. Rinn Motor Hotels, Inc*., 195 Cal.

15   App. 3d 1032, 1051 (1987) (citations omitted); Cal. Civ. Code § 3275.

16         With respect to the first principle, it is well-established that "an option . . . constitutes an

17   irrevocable offer that can be converted into an enforceable contract only by acceptance on the

18   terms specified in the offer." *Simons v. Young*, 93 Cal.App.3d 170, 180 (1979); *see also Bekins*

19   *Moving & Storage Co. v. Prudential Ins. Co. of America* 176 Cal.App.3d 245, 251(1985) ("tenant

20   must apprise the lessor in unequivocal terms of his unqualified intention to exercise his option,

21   within the time, in the manner, and on the terms stated in the lease"); *Palo Alto Town & Country*

22   *Vill., Inc. v. BBTC Co*., 11 Cal. 3d 494, 498 (1974)("when the provisions of an option contract

23   prescribe the particular manner in which the option is to be exercised, they must be strictly

24   followed."). Thus, for example, "[u]nless an option is properly exercised within the time specified,

25   it expires and the optionee loses any rights it may have had under the option." *Renewable Land,*

26   *LLC v. Rising Tree Wind Farm, LLC*, 2013 WL 497628, at *1 (citing *Simons v. Young*, 93 Cal.

27   App. 3d at 182). The only exception to the strict compliance rule is where "there is a waiver by

28   the optionor or evidence of conduct which might estop the optionor from insisting on strict

United States District Court
Northern District of California

compliance with the option," such as "fraud, evasion, acceptance of a nonconforming tender, or other conduct by the optionor calculated to frustrate effective exercise of the option." *Renewable Land, LLC v. Rising Tree Wind Farm*, *LLC*, 2013 WL 497628, at *1 (citing *Riverside Fence Co. v. Novak*, 273 Cal.App.2d 656, 662–63) (1969)).

It is also accepted under California law that in the context of the landlord-tenant relationship, a lease may not be terminated based on a breach by the tenant unless the breach is as "material," "substantial," or "total." *Superior Motels, Inc. v. Rinn Motor Hotels*, Inc., 195 Cal. App. 3d at 1051 (citations omitted).  Quoting Cardozo, the court in *Superior Motels* explained:

> "The courts never say that one who makes a contract fills the measure of his duty by less than full performance. They do say, however, that an omission, both trivial and innocent, will sometimes be atoned for by allowance of the resulting damage, and will not always be the breach of a condition to be followed by a forfeiture." (*Jacob & Young v. Kent* (1921) 230 N.Y. 239, 241 [129 N.E. 889, 23 A.L.R. 1429].

*Id*.   The court went on to explain that "[w]here the line is to be drawn between the important and the trivial cannot be settled by a formula" but rather, depends on the setting.  *Id*. (citing  2 Williston on Contracts, sec. 841).  It is a question of fact, the court opined, and requires the fact-finder to "weigh the purpose to be served, the desire to be gratified, the excuse for deviation from the letter, [and] the cruelty of enforced adherence. . . . [T]he law will be slow to impute the purpose, in the silence of the parties, where the significance of the default is grievously out of proportion to the oppression of the forfeiture." ( *Id*.) (quoting *Jacob & Young v. Kent*, 230 N.Y. 239, 243-44 (1921)).

These principles are also reflected in California Civil Code section 3275, which provides that "[w]henever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."  Cal. Civ. Code § 3275.

The case law is less clear, however, on the question of whether the rules that govern forfeiture under California law apply to renewal options.  California courts have made some broad pronouncements on this issue suggesting that they do not.  For example, in *Bekins Moving &*

United States District Court
Northern District of California

15

*Storage*, a case involving failure to timely exercise an option to extend the term of a lease, the court recognized that "California courts afford relief from forfeiture in appropriate cases" but found that the law governing forfeiture had "no application to the facts before us" because "[i]n order for there to be a 'forfeiture' there must be some right or vested interest involved [and] [a]n option is merely an offer." 176 Cal. App. 3d at 253-54; *see also Swift v. Occidental Mining & Petroleum Co.*, 141 Cal. 161, 173 (1903)("The waiver of the forfeiture is one thing, the renewal of the lease is quite another. The neglect of the landlord to strictly enforce his right of forfeiture for breach of condition does not entitle the tenant to a renewal when such renewal is dependent upon faithful performance of conditions."). These pronouncements must be understood in the broader context of California law, however.  In particular, both the California Supreme Court and the Ninth Circuit, applying California law, have recognized that at least under *some* circumstances, a landlord's refusal to extend or renew a lease pursuant to an option agreement may give rise to a forfeiture such that the principles of equity come into play.  *See Holiday Inns of Am., Inc. v. Knight*, 70 Cal. 2d 327, 330 (1969);  *Title Ins. & Guar. Co. v. Hart*, 160 F.2d 961, 963 (9th Cir. 1947).

     *Holiday Inns* involved an option contract for the purchase of real property.  70 Cal. 2d at 328.   To exercise the option, the optionee was to give written notice by April 1, 1968,  make an initial payment of $10,000, and make four additional payments of $10,000 on July 1 of each year, commencing in 1964; these payments were not to be applied toward the purchase price.  *Id*.  The contract also contained a cancellation provision providing that "it is mutually understood that failure to make payment on or before the prescribed date will automatically cancel this option without further notice."  *Id*.  The optionee paid the initial installment and the first two $10,000 payments on time, but the next payment arrived on July 2 rather than July 1 and so the optionor declared the option terminated pursuant to the cancellation provision.  *Id*.  In the meantime, the optionee had invested a great deal of money to develop a major residential and commercial center on the land adjacent to the option property, resulting in an increase in value in the option property.  70 Cal. 2d at 329.  The court noted that the optionees' "purpose in entering into the [lease containing the option provision] was to put themselves in a position to secure the advantage of this

increase in value resulting from their development efforts." *Id*.

The optionee sued and asked the trial court to find that the option was in force under California Civil Code section 3275. *Id*. Although the trial court denied the requested relief, the California Supreme Court held that it should have granted relief from forfeiture under section 3275. *Id*. The California Supreme Court recognized that "the time within which an option must be exercised . . . cannot be extended beyond that provided in the contract [because] [t]o hold otherwise would give the optionee, not the option he bargained for, but a longer and therefore more extensive option." *Id*. It also acknowledged that "most of the cases considering section 3275 have involved land sale contracts" rather than option contracts. *Id*. It explained, however, that "[i]n determining whether a given case falls within section 3275 . . . it is necessary to consider the nature of the contract and the specific clause in question." *Id*. The court continued, "[a]lthough the contract in the instant case is an option contract, the question is not whether the exercise of the option was timely, but whether the right to exercise the option in the future was forfeited by a failure to pay the consideration for that right precisely on time." *Id*. at 330. The court concluded that "[w]ith the passage of time, plaintiffs have paid more and more for the right to renew, and it is this right that would be forfeited by requiring payment strictly on time." *Id*. at 331. Accordingly, the court found that summary judgment should have been granted in favor of the optionee and relief from forfeiture granted under Section 3275. *Id*. at 332.

*Title Ins. & Guar. Co. v. Hart*, involved a lease of a mining property that contained an option to renew for a ten-year period following the initial ten-year term. 160 F.2d 961, 963 (9th Cir. 1947). The option provision provided as follows:

> In consideration of, and the faithful compliance thereto by said lessees of the foregoing agreement and covenants therein, the said owner agrees that upon written application of the lessees to grant unto said lessees a further lease upon said mine, its improvements and acquisitions, an extension of this lease for a further term of ten years under the same covenants, royalties and rights.

*Id*. The original lessee never took possession of the mine, which was in extreme disrepair at the commencement of the lease period, but after its interest was assigned to "one Ilseng, who formed the Mt. Gaines Mining Co., a Nevada corporation, and assigned to it the lease in question," the

mine became not only operational but profitable, generating significant royalties for the lessor. *Id.* at 963. When Mt. Gaines attempted to exercise the option to extend, however, the lessor refused to renew the lease on the basis that the lessee had breached various provisions of the lease and therefore had not met the condition precedent for the option that it must have faithfully complied with the terms of the lease. *Id.* at 970.

The court reviewed a long list of breaches, finding that some had been excused, others did not constitute breaches and the rest were insignificant. *Id.* For example, as to allegations that certain payments were made a day or two late and that on occasion the lessee failed to send the required "statement" with the payment, the court opined that these breaches "hardly require serious discussion as a basis for refusing to renew a least on a mine improved by lessees from a virtually valueless property to one worth nearly $300,000." *Id.* at 968. The court found that the lessee had satisfied the "faithful compliance" requirement of the option clause, citing the fact that there had been "no deviation from faithful performance of the lease because of any grossly negligent, willful, or fraudulent breach of duty" and rejecting the owner's insistence that the provision required strict compliance. *Id.* The court opined:

> It is not reasonable in human experience to expect that there could have been full, exact, strict, complete and perfect compliance with all of the covenants. Operators of a mine are dependent on all their employees doing their full duty at all times. Despite the exercise of the highest standard of care some breaches were bound to occur over a 10–year period.

*Id.* at 970. The court also cited the fact that the lessees were ready to comply when violations were called to their attention and none of the violations materially harmed the productivity of the mine. *Id.* at 970-71. The court went on to note that its conclusion found further support in California Civil Code section 3275, which the court found was "but an affirmance of the generally prevailing equitable principles." *Id.* at 971. The court noted, "[i]t can scarcely be questioned that the refusal to renew so valuable a lease would, if sustained, be a 'loss in the nature of a forfeiture.'" *Id.*

In *Kaliterna v. Wright*, a California court followed *Title Insurance*, finding that although the lessee had not strictly complied with the terms of the lease the landlord had waived full

18

1    performance of all of the covenants of the lease and therefore, the alleged breaches cited by the

2    lessor did not justify the landlord's refusal to extend the lease under the option provision in the

3    lease.  94 Cal. App. 2d 926, 936, (1949), overruled in part on other grounds by, *State Farm Mut.*

4    *Auto. Ins. Co. v. Superior Court,* 47 Cal. 2d 428, 304 (1956).  One of the alleged breaches was that

5    the lessor had enlarged the building on the property without obtaining written permission from the

6    landlord, as required under the lease.  *Id*. at 932.  The landlord had never complained that the

7    enlargement was not for the benefit of the property and the court found that it was.  *Id*. at 935.  In

8    support of its conclusion that the lessee was entitled to renewal of the lease under the equitable

9    principles that govern forfeiture, the court stated:

> The correct view is stated in *Title Insurance & Guaranty Co. v.*
> *Hart*, 9 Cir., 160 F.2d 961, which held a tenant entitled to renew
> although there had been some minor breaches of the lease. The
> decision . . . suggests that failure to renew a lease where the tenant
> had made large investments and improved the property would be "in
> the nature of a forfeiture," so that the court, under general equitable
> principles, should be careful to protect the tenant.

14    *Id*. (citing 160 F.2d at 936).

15         In *Bekins* - a case upon which 700 Valencia relies heavily -  the court expressly recognized

16    that under *Title Insurance*, where an option to renew a lease was timely exercised, "minor

17    breaches by a tenant who had made large investments in the property" might by overlooked.  176

18    Cal. App. 3d at 254.  It also cited *Kaliterna v. Wright*, noting that the California court in that case,

19    which also involved an option to renew a lease, had afforded forfeiture relief under *Title*

20    *Insurance*.  *Id*. (citing 94 Cal. App. 2d 926, 936 (1949)).  Those cases did not apply in *Bekins*, the

21    court held, because the lessee in *Bekins* did not give written notice within the time allowed in the

22    option provision in the lease.  *Id*. at 254.  The court explained that "an option is but an offer

23    which expires by its own terms if it is not accepted within the time prescribed."  *Id*. at 251

24    (citation omitted).  Therefore, it concluded that the lessee was not entitled to equitable relief

25    where the landlord had refused to extend the lease under the option provision in the lease

26    agreement.  *Id*.

27         The court in *Bekins* made some statements that might suggest that the loss of an option to

28    renew a lease can *never* constitute a forfeiture.  *See, e.g., id*. at 253 ("In order for there to be a

'forfeiture' there must be some right or vested interest therein.  An option is merely an offer").  Nonetheless, the case cannot properly be read to stand for such a broad proposition in light of *Holiday Inns*, *Title Insurance* and *Kaliterna*.  Rather, the Court concludes that *Bekins* stands for the narrower proposition that an optionee must strictly comply with the requirements of the option provision as it relates to the timing and manner in which the option is exercised.[7]

## C.    Application of Legal Standards

The parties' summary judgment motions turn on two basic issues: 1) do the undisputed facts establish that Farina was not entitled to exercise the option to renew the lease because it was "in default" for the purposes of Paragraph 56.1 of the Lease (or conversely, that Farina *was not* in default under that provision and therefore was entitled to exercise the option to renew); and 2) do the undisputed facts establish that Farina complied with the requirements of Paragraph 56.1 as to the timing and manner in which it gave notice of its intent to exercise the option to renew.  The Court concludes that there are material disputes of fact as to both issues and therefore, that neither party is entitled to summary judgment.

---

[7] This reading of California law is also consistent with a leading treatise on California real estate law, which states that:

> Equity sometimes may permit exercise [of an option to extend or renew a lease term] while in default. When the notice of exercise has been given in a timely manner, the tenant in default can exercise the option effectively if it has a substantial investment in the property and the defaults by the tenant are minor [citing *Title Ins. & Guaranty Co. v. Hart*, 160 F.2d 961, 966  (9th Cir. 1947); *Bekins Moving & Storage Co. v. Prudential Ins. Co.*, 176 Cal. App. 3d 245, 254 (1985) (dictum)], or the landlord has waived the defaults [citing *Kaliterna v. Wright*, 94 Cal. App. 2d 926, 936 (1949)], or the landlord's conduct renders strict compliance with the lease or the renewal provisions futile [citing *Penilla v. Gerstenkorn*, 86 Cal. App. 668, 670–671(1927)].  In some cases a court may exercise its equitable jurisdiction and permit a lessee to renew a lease even though he or she is in violation of material terms of the lease [citing *Title Ins. & Guaranty Co. v. Hart*, 160 F.2d at 970; *Kaliterna v. Wright*, 94 Cal. App. 2d at 939-940].

Miller and Starr 10 Cal. Real Est. § 34:36 (4th ed.) § 34:36.

United States District Court
Northern District of California

### 1. Whether Farina Satisfied the Requirement that it Must Not be in Default to Exercise the Option to Renew

Defendants cite a variety of alleged breaches of the Lease that they contend bar Farina from exercising the option to renew as a matter of law, including the unauthorized Kostelni sublease, the alleged failure to pay property taxes for certain years, some rent payments that were made late or that were returned for insufficient funds and at least one lien notice that was received by 700 Valencia. Farina counters by arguing that the undisputed facts show that *none* of these breaches justifies rejecting its exercise of the renewal option. The Court is not convinced by either party's position.

As a preliminary matter, the Court addresses the question of whether the prohibition against default in the option provision of the Lease must be strictly construed to allow 700 Valencia to reject Farina's exercise of the option to renew for any default on the Lease agreement, no matter how minor, as the language of the provision seems to suggest. The Court concludes that such a strict reading of this requirement is improper under the facts of this case. There is uncontroverted evidence in the record that Farina invested a large amount of money to build a restaurant in a building that was only an empty shell at the commencement of the original lease. As in *Title Insurance*, this investment will be lost if the Lease is not renewed under the option agreement and therefore, the principles of equity come into play. Consequently, in order to establish that its refusal to extend the lease was proper, it will be necessary for 700 Valencia to demonstrate not just that Farina violated some provision of the Lease but that the breach was material and that 700 Valencia did not waive the obligation at issue; alternatively, 700 Valencia may be able to prevail by demonstrating that the conduct that gave rise to the alleged defaults constituted a "grossly negligent, willful, or fraudulent breach of duty" such that equitable relief from forfeiture is not available to Farina. *See* Cal. Civ. Code § 3275. Conversely, to show that it was entitled to exercise the lease option, Farina will have to establish that the breaches were either waived or too minor to warrant a forfeiture of its investment, and that its conduct was not grossly negligent, willful or fraudulent. There are factual disputes on all these questions however.

#### a. Kostelni Sublease

Farina does not appear to dispute that it entered into a sublet agreement with Kostelni, or

that it did not obtain permission from 700 Valencia as required.  It contends, however, that Section

26.1 of the Lease does not require written consent because it excepts "agents, employees, and

invitees" of the tenant from the permission requirement.   The Court disagrees.  Farina's reading of

Paragraph 26.1 is inconsistent with the plain language of that provision.  As discussed above,

Section 26.1 provides, in relevant part, that:

> TENANT shall not sell, assign, mortgage, pledge, hypothecate,
> encumber or otherwise transfer this Lease or any interest therein,
> and shall not sublet the Premises or any part thereof, or suffer or
> permit the Premises or any part thereof to be occupied by any other
> person (the agents, employees, and invitees of TENANT excepted),
> without the prior written consent of LANDLORD in each instance.

Lease ¶ 26.1.  Because of the comma after the word "thereof," the Court finds that the most

natural reading of the parenthetical "the agents, employees, and invitees of TENANT excepted" is

that it relates to the clause "or suffer or permit the Premises or any part thereof to be occupied by

any other person" and not to the clause stating that the tenant "shall not sublet the Premises or any

part thereof."   In addition, Farina's interpretation of this provision leads to absurd results,

allowing it to sublet without permission to anyone it invites on the premises and creating an

exception that renders the written permission requirement meaningless.  Such an interpretation is

inconsistent with the rules of contract construction under California law.  *See ASP Properties Grp.*

*v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1269 (2005) ("Interpretation of a contract must be fair and

reasonable, not leading to absurd conclusions") (quotations and citation omitted).

Because Farina was required under the Lease to obtain written permission to sublet the

premises to Kostelni, the question becomes whether Farina's failure to do so was a default that

warrants forfeiture of the option to renew. There is no evidence in the record that 700 Valencia

waived the obligation to obtain permission to sublet the premises to Kostelni;  indeed, it is

undisputed that 700 Valencia was not aware of the sublet until after the term of the original lease,

and the Kostelni sublease, had already expired.  Under these circumstances, 700 Valencia did not

have the opportunity to waive the enforcement of this requirement and the Court holds as much as

a matter of law.   There are factual questions, however, as to whether the breach was material and

whether Farina's conduct in subletting the premises to Kostelni involved grossly negligent, willful

22

1    or fraudulent conduct.

2         With respect to materiality, the reasoning and holding in *Superior Motels, Inc. v. Rinn*

3    *Motor Hotels, Inc*., 195 Cal. App. 3d 1032, 1051 (1987) supports the conclusion that breaches of

4    contractual provisions limiting the right to sublet may be material,  even if the lessee continues to

5    be liable for breaches of the lease by the sublessee.   Although the facts of the *Superior Motels*  are

6    "complex" and involve a "bewildering procession of corporate acquisitions, name changes and

7    restructurings,"  the basic facts that are relevant here are as follows.  195 Cal. App. 3d at 1042-43.

8    Superior Motels as lessee and Lamplighter as lessor entered into a lease agreement for a hotel

9    property.  *Id*. at 1041.  The lease contained a provision that appointment of a receiver would be a

10   breach of the lease.  *Id*. at 1042.  Subsequently, Superior assigned its interest in the lease to Rinn

11   Motor Hotels but Superior continued to be liable for any defaults by Rinn under the original lease

12   and Superior had a right of reentry if Rinn failed to cure those defaults.  *Id*. at 1042-34.  When

13   Rinn appointed a receiver, Superior invoked the reentry provision, contending that the assignment

14   was a material breach of the lease with Lamplighter.  *Id*. at 1044.   The court agreed.  *Id*. at 1055.

15        In reaching its conclusion, the Court in *Superior Motor Hotels* recognized that the anti-

16   receivership provision was intended to protect  the "lessor's primary concern with the

17   uninterrupted payment of rent" and to "ensure that the lessor is not forced into an involuntary

18   relationship with a tenant not of his choosing."  *Id*. at 1054-55.   It went on to hold that the

19   assignment of the lease to a receiver constituted a material breach of the lease, *even though* the

20   Superior continued to be responsible for all of the obligations under the lease, including the

21   payment of rent to Lamplighter.   The prohibition against subletting contained in the Lease in this

22   case implicates similar concerns to those in *Superior Motor Hotels*.   Nonetheless, as discussed

23   above, the question of whether a breach is material depends upon the setting and is typically a

24   question of fact.  Therefore, the Court declines to decide on summary judgment whether entering

25   into the Kostelni sublease without 700 Valencia's permission was a material breach of the Lease.

26        Finally, the Court concludes that there are factual disputes as to whether Farina's conduct

27   in entering into the Kostelni sublease without permission from 700 Valencia was grossly negligent

28   or fraudulent.  Therefore, the Court declines to decide on summary judgment whether the Kostelni

23

1   sublet agreement justified 700 Valencia's refusal to renew the Lease.

2               b.   Property Taxes

3         700 Valencia contends Farina failed to pay property taxes for two separate years,

4   amounting to $12,500 in unpaid property taxes.  The Court rejects Farina's argument that this

5   breach is trivial *as a matter of law* because 700 Valencia should have taken the unpaid taxes from

6   the $24,000 security deposit.  Paragraph  9 of the Lease makes clear that 700 Valencia had no

7   obligation to use the security deposit to satisfy the unpaid tax obligation, expressly stating that

8   "[t]he Security Deposit may be retained, used or applied by LANDLORD to remedy any default

9   by TENANT."  Lease ¶ 9.   On the other hand, the Court also rejects 700 Valencia's argument that

10  the failure to pay these property taxes justifies its refusal to extend the lease as a matter of law.

11        There are factual disputes as to whether 700 Valencia gave Farina timely notice of the

12  outstanding taxes, which is relevant to whether there may have been a waiver by 700 Valencia as

13  to this obligation.   In addition, the relatively small amount of the taxes that were allegedly unpaid

14  and the fact that 700 Valencia apparently declined to use the security deposit to cover these

15  outstanding property taxes may be considered in determining whether the alleged breach was

16  material.  Therefore, summary judgment in favor of either party based on the alleged failure to pay

17  certain property taxes is not appropriate.

18              c.   Rent payments

19        700 Valencia has pointed to certain rent payments that were made after the first of the

20  month, as well as some checks that were returned for insufficient finds.  Farina, in turn, has

21  offered evidence that 700 Valencia orally modified the Lease agreement to allow payment by the

22  fourteenth day of the month rather than the first of the month; it has also introduced evidence that

23  some of the returned checks were the result of a bank error and that it promptly notified 700

24  Valencia of the error.  Finally, Farina has pointed to the absence of notice from 700 Valencia as to

25  some of these alleged defaults.  Because of this conflicting evidence the Court finds that there are

26  material disputes of fact as to whether these alleged breaches were material or waived by 700

27  Valencia.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

       d.  Liens

700 Valencia has presented evidence that it received one or more notices of a $674 lien for late payment for garbage services.  Farina contends it never received notice from 700 Valencia of the liens.  While it appears questionable whether the lien notices were a material default, the Court declines to decide that question as the facts surrounding the liens are murky.

       e.  Conclusion

The Court finds that there are fact questions that preclude summary judgment on the question of whether Farina's alleged breaches of the Lease barred it from exercising the option to renew the Lease for another five-year term.

**2.  Whether there are Disputed Facts Relating to the Exercise the Option**

Farina has introduced evidence that in December 2014 (which was within the option period) it sent John O'Connor, by certified mail, a written notice of its intent to exercise the renewal option.  In particular, it has submitted a copy of the letter that it says it sent to 700 Valencia and a declaration of the individual who says that she placed the letter in an envelope and mailed it to 700 Valencia, Erica McDowell.  McDowell also states in her declaration that she prepared an envelope for Minna to give to O'Connor at a January meeting and that the Option Notice was in that envelope. Minna says he gave the envelope to O'Connor at the meeting, where they discussed the renewal of the lease, among other things, and points to an agenda that listed as one of the items for discussion "Request of commercial lease amendment for second 5-years period after Option Term One including also [Global Trading & Marketing]."

700 Valencia, on the other hand, offers a completely different version of events.  O'Connor insists that although he received a certified mail envelope from Farina around this time it did not contain the Option Notice but only a rent check.  He also denies that a second copy of the letter was given to him when he met with Minna in January, 2015, stating that although an envelope containing some documents was handed to him, it did not contain the Option Notice.  He states generally that he and Minna did not discuss the renewal option at that meeting, though he does not specifically address the meeting agenda referring to the renewal option.

This conflicting evidence gives rise to a material factual dispute as to whether Farina sent

the Option Notice at all.  As noted above, given the sharp contrast in the testimony of those involved, it is difficult to escape the conclusion that one or more individuals may have offered false testimony in this case.  While the Court does not draw any conclusions or express any opinions at this time regarding the truthfulness of those who have offered testimony in connection with the pending motions, it notes that if the fact-finder (in this case, the Court at the upcoming bench trial, as stipulated by the parties) concludes that 700 Valencia engaged in conduct "calculated to frustrate effective exercise of the option," the law of equity, including the rules of estoppel, may be implicated.  *See Renewable Land, LLC v. Rising Tree Wind Farm*, LLC, 2013 WL 497628, at *1 (citing *Riverside Fence Co. v. Novak*, 273 Cal.App.2d 656, 662–63) (1969)).[8]

## IV.    CONCLUSIONS

For the reasons stated above, the Court finds that there are disputed issues of material fact as to both of the key issues relating to whether Farina continued occupation of the premises is lawful.  Accordingly, the Motions are DENIED.

**IT IS SO ORDERED.**

Dated: October 2, 2016

JOSEPH C. SPERO
Chief Magistrate Judge

_____

.

United States District Court
Northern District of California